May it please the court, my name is Alec Saucek and I represent the plaintiff's appellants in this case and joining me here at the counsel's table is my colleague Christina Guillard and we respectfully reserve five minutes for rebuttal. There are several reasons stated in the brief as to why we seek the reversal of the lower court's decision, but the principal reason deals with the application of the plausibility standard as it applies to the complicated and factually intensive allegations in a complaint. Firstly, we contend that the plaintiff's plausibly stated that the defendants who are our client's direct competitors in the area of specialty pharmacy business extorted or attempted to extort plaintiff's property. We also contend that plaintiff's plausibly stated an agreement to restrain trade and we also contend that the plaintiff's plausibly stated the dangerous probability of monopolization for the purposes of stating Sherman Act 2 claim. As the Supreme Court stated in Twombly and Iqbal, a complaint should not be dismissed solely because the judge below does not believe the version of the events alleged by the plaintiffs. We contend that this is exactly what the district court did. Particularly highlighted by the fact that the dismissal was without leave to replete. Plaintiff's civil recall claim is predicated on allegations of, on allegations of, on a violation of the Hobbs Act, of the conspiracy of the Hobbs Act. The Supreme Court's and this circuit's precedent is clear. It is the right to conduct business free of interference. The right to service one's customers and generally the right to compete that are the kinds of rights that can be extorted. The district court dismissed the civil recall count because, as we contend, it misapprehended the nature of the right at issue. We believe that the district court deemed the only right alleged in the complaint was the right to participate by my clients in the opt-in provider networks. And this is simply not the case. What is the source of their right to participate? Well, the source of the right to participate goes back to the any willing provider law. But to any willing provider laws that exist on both the state level and the federal level. But it's not the right at issue here. It's not the right to participate in the provider networks that we contend was extorted from my clients. It is the right to my client's specialty pharmacy business that was extorted. So for purposes of stating a Hobbs Act-based predicate, plaintiffs allege that defendants threatened to obtain their specialty pharmacy business. The source of your difficulty is that you were not allowed to join the network. Your Honor, the- Three, two or three of your- Well, Your Honor, the source of the property, the property already existed. My clients had a substantial volume of specialty pharmacy business in Texas and in California. The specialty pharmacy business is the kind of transferable property that can be extorted. Now, there's no doubt that extortion requires an element of attempting to obtain. Now, the court below found that the element of obtaining the property was not satisfied, but this analysis is false. Defendants are insurance companies, true. And they cannot obtain the right to participate in the provider network. But this is not the right at issue that we believe was obtained, that we contend. So you're saying that it's not relevant. I think in the briefing, if I recall correctly, there were some additional reasons given why your client was not allowed to join this particular network. And you're saying that that isn't really relevant to the case that you're making, the violations that you're alleging, right? Correct, Your Honor. This is essentially a red herring. The right to participate in the provider network is extremely important. This right was violated by the defendants. But it's really not the right that we contend was at issue here. Extortion did not concern with my client's right to participate in the provider network. That right is relevant, but it's not the only right. Now, you're going to unquestionably hear from the defendants that the reason why they weren't allowed in the network was because of the concerns of fraud, waste, and abuse, and particularly in the so-called heat zones. As I said, the Houston, Dallas, and Los Angeles were the three hotbeds of fraud. And they did all this and all of those, and they came back with signs of fraud themselves, a disconnect between your invoices and your billings, and your seats, I guess it is. And I didn't read anybody's challenges, those findings. Well, your honor, what they say in the- But that's, my point is that, that I'm trying to get an answer to is that, that's the basis upon which they assert that you are not going to join the network. Being in the network, you allege, is very, very important because of the large numbers of facilities and given, and their clientele, not in health work, et cetera, to get in business. So, and they gave three reasons why not, as my colleague was suggesting to you. What's the answer to that? Well, your honor, we're at the pleading stage. The complaint, the allegations in the complaint are, the allegations in the complaint are entitled to the presumption of truth. We say that there were no improprieties. We're saying that OptumRx and other defendants engineered the scheme whereby my clients attempted to apply to be providers in a network. You allege that, but you have to have some plausible theory for that, big ball like. And I don't, I don't, I'm trying to get an answer to, you say you, you don't contend that you had some kind of right to be a membership, and, and a membership, but you complain about your exclusion from it. No, your honor, we absolutely do contend that we have the right to be in a network. And I think it's very important for the court to, to reach. Now tell me what that right is. Let me go back to the first question I asked you. What is that right? Well, that right is based on the Texas Any Willing Provider Law. Texas Any Willing Provider Law, which we believe and that we brief extensively in our submission, is not preempted by ERISA. And it's also based on the federal Any Willing Provider Law that essentially states that any pharmacy that is willing to service Medicare Part D patients has the right to participate in a provider network that has Medicare Part D patients. The, the Texas Any Willing Provider Law is not preempted by ERISA. There is an, there was an argument made that it was. And indeed in 1990. But none of those would be violated if, if their, if the results of their audits, which they assert was the basis for their actions, were, were, are valid. Is that correct? Well, they, we, we have to understand the position that OptumRx has placed itself in. The defendants OptumRx is in a, is in a unique position where it's been entrusted with federal and state healthcare dollars to administer pharmacy benefits. At the same time, it is a direct competitor to pharmacies such as my client. It operates specialty pharmacies throughout the country and it competes for the same exact business as my client's. Now at the same time, OptumRx has the right, and not just Optum, but all the parent companies of Optum, have the right, and indeed they do, various audits. And they conduct certain types of reviews and certain types of credentialing, administer certain types of credentialing tests that are designed to ensure that certain pharmacies whose business OptumRx desires are either kicked out of the network or not admitted into the network. And we contend that this is the nature of the extortion. They essentially placed my clients in a situation where they felt that if they did not, if they did proceed with the unreasonable credentialing requirements and the unreasonable processes that Optum put in place, that all of their pharmacies in New York and elsewhere would be terminated from OptumRx networks based on affiliation. This is the sole reason that one of the pharmacies was terminated from the, were not admitted into the network, Cedra Dallas. And that pharmacy, there were no issues whatsoever. And we do contend that there were absolutely no issues that, given the opportunity to present proper evidence, would be standing in the Cedra Houston situation. Cedra Houston had no issues. It had the right to be part of the provider network based on state and federal any willing provider laws. It had a substantial amount of business, at least $20 million worth of business in specialty pharmacy. And if they were allowed to proceed to the credentialing part to satisfy the requirements that under federal and state any willing provider law must be satisfied by all pharmacies that they're willing to be admitted. They would have been admitted and they would have realized the right to profit from the existing business that they- You cite only state court law so far. What you had with the antitrust violations, the RICO violations, in your briefing. Can you help me with the, what are your antitrust violations? You got Optum with 22%, CVS with 24%, and Express Scripts with 29%. Those aren't exactly dominant forces in the market. And I don't understand from your platings what the definition of your market is. Your Honor, it's a very good question. It's a very important question to the Sherman Act, one and two claims. And we contend that the relevant product market is the market for specialty pharmacy services for those patients whose pharmacy benefits are administered by Optum Rx. Now, we have to understand the mechanics of how it works. A patient has insurance, let's say, from United Healthcare or from another company. They're locked into a particular PBM, such as Optum Rx. They have no choice to go to anybody else. When they need specialty- Yeah, well, my understanding is that you say they have no choice. There's a difference between saying they have no choice and that their economic incentive is simply to not go there because it's going to cost them more if they go out of network. No, Your Honor, this is not really the case. Within the relevant market that we define- I'm sorry? Within the market that we have defined, which is the market for specialty pharmacy services, a patient has a choice to either go to an independent pharmacy, such as my client's, or they have a choice to go to a mail-order pharmacy, such as Optum Rx. Now, if more pharmacies, such as my client, are eliminated from this network, from this market for specialty pharmacy services, patients have no choice but to go to the Optum Rx specialty pharmacy services, specialty pharmacies. And now, here's what happens. Optum Rx- Well, they're being- Optum Rx are doing that. Well, they're being eliminated through pre-textual audits. I'm sorry? Pre-textual audits. They're being- Non-admission. Well, one way how they can be eliminated is through non-admission. Another way they can be eliminated is by sending numerous audits to pharmacies that are impossible, most of the time it's impossible for them to comply with. There are no discernible criteria that Optum provides to the pharmacies to satisfy these audits. They stall. They do not give answers. They essentially stonewall pharmacies, and it- But you're saying they don't admit them is what I'm asking. Well, this is- Either they delay or they don't admit. Well, this is one of, this is the specific issue in this case. They did not admit my clients into the network. But once the pharmacies are in the network, specialist, for instance, specialty pharmacies, they can eliminate those pharmacies from the network as well. And this is how they, this is the conflict of interest situation that Optum has put itself in. By eliminating these pharmacies, it essentially drives business to its own pharmacies. And why? Because patients just do not have any information about anybody else. Any other pharmacy, they have the only information that they're constantly bombarded with is, oh, we have a great pharmacy affiliated with your health insurance plan. OptumRx-owned pharmacies, come to us, you'll get great terms, you'll get wonderful service. Unfortunately, other pharmacies, such as my client, are not able to directly market to these patients, their services, and it ends up being an Optum knows that, and that's the reason why it did it. Let me just ask you, what is your preferred relief in this case? Is the point that you've been excluded from the network, your client's been excluded from the network, and that you would like to be able to participate like the other pharmacies? Or is it for a monetary award, and then you go your separate ways? We would be happy with an opportunity to fairly participate in the enrollment process and be given due consideration. And hopefully, obviously we will be able to submit all the required documentation. And we're absolutely certain that given an opportunity to participate, we will be able to participate. And what do you believe is the motivation when you file a civil RICO suit? Do you believe that there is a motivation to either pressure, the defendants are pressuring the plaintiffs so as to put them out of business or to acquire them unfairly on very unreasonable terms? Is that the belief of the plaintiffs in this case? We believe that the plaintiffs are engaged in this- You mean the defendants, the defendants in this case. We believe that the defendants have been engaged in this practice for a long time. And this is essentially the well-publicized and well-known issue in the PBM industry. I've been doing this since 2002. Many independent pharmacies are suffering from these type of practices of PBMs who are essentially in a situation of a conflict of interest. And they're essentially pressuring independent pharmacies out of business. And yes, our clients suffered a direct injury. They lost profit. They would have made a substantial profit servicing the existing specialty pharmacy business that they had, which they ended up losing because of the situation that they were placed in by the PBMs. All right, thank you. So you've reserved your rebuttal time. Let's hear from Mr. Murata. Thank you. Thank you, Your Honor, and may it please the court. Sean Murata on behalf of the defendants' appellees. This case at bottom is about Cedra's unhappiness with Optum's credentialing practices. Because they believed that they had passed the audits that Optum had imposed, and Optum believed they had it. But it's not RICO, and it's not antitrust. And this court and the Supreme Court have held on both of those claims that you shouldn't make every business dispute into a RICO claim or into an antitrust claim because of the significant discovery costs and other burden and inconvenience that it placed on defendants to make these very serious allegations. Remember, Cedra is not just raising a business dispute. They are accusing defendants of a very serious set of federal crimes. But yet their complaint simply does not live up to what they have claimed in this case. When it comes to RICO, the key flaw is they have not alleged a transferable property right that Optum or any of the defendants obtained from them. Because, and what we saw at argument today is a little bit of a misdirection. Because they would at first say that the property right that is being alleged is the right to be part of the network, which is created under the Any Willing Provider laws. But the problem with that is that even if you assume that that's a property right, it's not a property right that the defendants obtained. And as what the Supreme Court said in Sakhar and in Schneider, is it has to be the kind of right that can be bought, sold, or transferred. And you can't buy or sell or transfer the right to be in the Optum network. In fact, everyone has the right to be in the Optum network. If you meet Optum's standard terms and conditions, you too can be an Optum provider. That's the whole point of the Any Willing Provider laws, preempted or not. And so, Revia, which is the specialty pharmacy subsidiary that plaintiffs refer to, didn't obtain from plaintiffs their right to be in the network. And in fact, it would have no reason to obtain that right, even if you could, because it's already in the network. It's already providing these services. So, I think perhaps noticing that problem, what plaintiffs pivoted to is they say, well, what was taken from us was the business. But that's not a property right. They have no property right to the customers. They don't own the customers. They don't buy and sell the customers. They at most have an incoherent hope that their customers will keep coming back to them. But again, under Schechner and Schneider, what you have to show is that you had a property right in the sense that it can be bought, sold, or transferred. And the patients don't fall under any of those categories. They're not chattel that businesses sell to one another. So, for that reason, the RICO claim fails, because there has been no obtainable property right that was taken by Optum and given to anyone. At most, there's an allegation of coercion, which is there were some wrongful conduct which interfered with the business. And I think what plaintiffs did very much is they argued, well, we have a property right. But as, again, Schechner and Schneider make clear, having a property right is only the first step. It has to be obtained. That is what differentiates Hobbs Act extortion from other crimes like coercion. And I don't think you've heard from plaintiffs explain either what was taken and transferred or what was taken and transferred allegedly here in the business constitutes a property right that they own. And that is even before you get to the other problem with the RICO claim, which is that there is no RICO enterprise. Because it's clear under this court's cases that there has to be distinctiveness. The RICO enterprise and the RICO defendant can't be the same person. So, there are two enterprises alleged. One is the network enterprise, which essentially is the pharmacies, the plan sponsors, Optum and everybody in their totality. But, of course, the plan sponsors don't really know or care about one another. And the thousands of pharmacies, remember, there are actually thousands of independent pharmacies in the network right now. They're all competing with one another. So, this RICO enterprise they're alleging is just a bunch of differentiated contractual actions of people in the PBM market and filling those claims. So, that's separately fatal to the RICO claim. Moving over to the antitrust side, I think the questions from Judge Higginbotham struck pretty well, which is, one, it's unclear from plaintiff's briefs and their pleadings what their defined product market is or even what the geography of that market is, both of which are essential to a well-pled antitrust claim because that's how you measure the anti-competitive effects and that's how you measure attempted monopolization. The only market percentage that's set out in the complaint is 22% of the PBM market, which is, in other words, patients who use PBMs, 22% of them are Optum. But actually, a lot of the competition and the bumping off that plaintiffs are complaining about is occurring at the specialty pharmacy level. And we have no allegations in the complaint about what the specialty pharmacy market looks like, what percentage of the market, for instance, that Brevia holds. And that's essential because under this court's cases, 20% or less of a market share fails as a matter of law in an attempted monopolization. Can you tell me a little bit about what a specialty pharmacy is? I'm familiar with shops that are compounders, niche players. Help me with what that is. Sure. So if you think of your retail pharmacy as the folks who count pills from big bottles to small bottles, let's say, a specialty pharmacy is a pharmacy that handles medications that either require special preparation or special storage. So for instance, hepatitis C drugs, which are one of the drugs that's mentioned in the complaint and is relatively profitable these days, that requires certain special handling and preparation and storage that, you know, your local Walgreens may not necessarily do routinely. And because it requires that, there's higher reimbursement as a result. So that's what a specialty pharmacy is. Now, I'll note that the Cedra Pharmacy is actually applied to be in the retail network. They apply to be part of the, like your Walgreens or CVS, the people from the big bottles to the small bottles. But they do have certain elements that, they do engage in some specialty pharmacy services. So that's what a specialty pharmacy is. And we have no, nothing in these pleadings that say about how Brevia is in the market and also how Brevia, a mail order pharmacy, is competing with these local specialty pharmacies that might be on your local corner. Are the specialty pharmacies also the ones that handle the medical marijuana or? I believe that's separate though. I'm not necessarily sure, Judge Stewart. It's just a class of, it's just a class of drugs that requires special handling, preparation or storage. So because it requires more skill and I think more investment, there's. Do the other pharmacy as well. Yes, yes. And that's a separate network and, you know, has different reimbursement rates because obviously there's less skill and perhaps higher volume involved. But what we don't know for these antitrust claims is anything about the local markets. We don't know how Brevia is competing in say the LA market or the Houston market or in the Dallas market because there's simply nothing in the complaint about it. And then when you move over to the conspiracy claim, the Section 1 claim, it's the exact side of claim that Twombly says is not enough to get past the pleading stage. Because remember, we talk about Twombly in sort of a generic sense but Twombly was a Section 1 claim. And what Twombly says is you can't just say the defendant's conspired because that's very easy to say and rather hard to prove. But what you can do is if you can get to discovery, you can impose the cost and the difficulty and the inconvenience of litigation on defendants and perhaps pressure them into settling. So what the district court correctly recognized was that once you distill out the things that were essentially that kind of legal claim which is the defendant's conspired with one another, all we have is that Optum and Catamaran at some point met to start talking about the synergies in the market that our two businesses may work together. And they had those discussions and eventually they decided to merge. And then they did merge and that's it. But of course there's no allegation that's been preserved that the merger itself was anti-competitive. There is no allegation and there is no allegation of facts of anything that was carried out as a result of this anti-competitive scheme. Plaintiff counsel today talks a lot about how Optum is just in the market trying to bump out these independent pharmacies but the only facts pleaded in the complaint is Cedra. There is not a single other pharmacy that is mentioned in the complaint other than Cedra that is apparently the victim of this scheme. Actually quite to the contrary, the allegation in the complaint is that there are thousands of pharmacies in the Optum network which cuts against the allegation that there are some anti-competitive scheme to do away with independent pharmacies in the network because Brevia competes with all of those pharmacies. So for all of those reasons, none of the claims are well pleaded and the district court was correct to dismiss them. And I think for similar reasons that the state law claims fail as well. Many of the claims are essentially derivative of the federal claims. For instance, the Texas tortious interference claim. I think plaintiff even admits rises and falls with the RICO and antitrust claim. There's a separate claim for tortious interference with business relationships that requires that the plaintiff show something that is independently tortious that took place. And again, there's no allegation of what independent tort took place other than RICO and antitrust. The no fair procedure claim fails for the simple reason that plaintiffs have never contested the district court's finding that they have never shown what was unfair about the procedure that was given to Cedra LA. And so again, for all of those reasons, all of the claims are properly dismissed. But I think what the court shouldn't lose sight of at the end is a lot of this discussion comes down to and I think maybe the question at the end got to is this is a garden variety business dispute. They think they met the credentialing requirements. We think they didn't. And rather than resolving those through the process or whatever other claims they might have under some other set of laws, they decided to bring RICO and antitrust actions. What did Optum and Catamaran Burge? I don't have the exact year of that, Your Honor, unfortunately. But I will say that the audits in this case occurred after the merger. The allegation of the complaint, as I understand it, is that the scheme was struck before these denials. And then the denials that took place are the continuation of the illegal antitrust conspiracy that was entered into. They've got a large Copperwell problem depending on the timing of that. They do. And I think what. I don't have one clear model in mind in terms of the claimed misconduct and the timing of the acquisition. Right, so as I understand their complaint, the claims are at time one, this antitrust conspiracy was engaged in, time two, the merger closed, which as Your Honor points out, they start running into some serious Copperwell problems. And then at time three, there was the Cedra denials. So the claim, I think, is that the illegal conspiracy happened before when they were distinct, and then it was carried through the new merged entity. But, you know, one, I think Your Honor points out that's a serious Copperwell problem. And second, this is all just allegation. There are no facts that are alleged in this complaint that give any plausibility to any of that happening. The only facts are is that they met, they talked, they thought it was a good business decision to combine, and they combined. And there was nothing in the complaint that raises the level of plausibility that what happened here was anything other than the normal carrying out of the credentialing process. Because remember, as I mentioned, the only pharmacies mentioned in the complaint are Cedra pharmacies. It's not as if they're pointing to some other pharmacies elsewhere that say, aha, they're doing the same thing to them too. So when Tom Hobley says, look at what's plausible, look at what facts are alleged, there is nothing plausible in this complaint that suggests an antitrust conspiracy. Unless the Court has further questions. Cedra did not raise in its main brief the matter of the disallowance by the District Court of them to amend their pleading, particularly with respect to the Sherman acclaim in the reply brief. They do say it was an abuse of discretion because it's in the reply brief. It's already been waived, but you didn't get to respond. So I'm asking you now your position on that matter raised in the reply brief. Sure. A couple things on leave to amend. First of all, there was no argument below until the exceptions to the magistrate's report and recommendation where we think about leave to amend. So in the initial opposition to the motion to dismiss, other than sort of the formulaic statement of the standards for a motion to dismiss, no mention of leave to amend. There was a hearing where the magistrate judge encouraged people to be ready to argue these motions on an abbreviated basis. Cedra said, boy, we're not ready to argue, Your Honor, but can we submit something in writing after? District magistrate judge said, sure, go ahead. They never submitted that writing. So again, another never request for leave to amend. And never, leave to amend never came up to the reports and recommendations, and of course that's too late. But I think there's a more fundamental problem, which is that even if you amended their complaint to conform to what's said in the appellate briefs and what was said from the podium today, in other words, even if you thought that their complaint said everything that they now think is the purest and most forceful sense of their claims, it still doesn't add up to a plausible claim. When you get on the RICO side in particular, they say it's about the judge didn't believe them. No, it simply is as a matter of law, what they have alleged their property rights are aren't transferable property rights. On the Sherman Act side, they say there's a certain infelicity to how the market was pleaded, but even if you sort of constructively amend their complaint to say, aha, now I understand the product market. It's the OptumRx, people who have OptumRx as their PBM in the areas around these pharmacies. If that's what the complaint said, you run into the problem that we know nothing about the competitive nature in that market or in that product. All we have is the 22% national number, by the way, which is why the district court focused on the national number, and that's it. And so we don't have any facts to back up that new product definition. So again, even if you granted them everything that they have said today and said, oh yes, that's what your complaint really meant, it would still be futile to amend, unless the court has further questions. All right. We'd ask that you defer. Thank you. All right. Rebuttal back to you, Mr. Solchick. Well, first I'd like to answer the question with regards to the timing of the merger between OptumRx and Catamaran, and that happened in July 2015. By that time, my clients already had at least $20 million worth of business in specialty pharmacy in Texas and California. The acts of consent... Let me go back to a question that my colleague asked you earlier in the argument. What do you seek in this litigation? What do you want? What are you trying to accomplish? Well, Your Honor, we'd like the court to reverse and essentially remand to the district court with an instruction that the complaint plausibly states civil RICO and antitrust violations. But eventually, obviously, what we want from this litigation is A, an opportunity to be part of the network, and B, and more specifically, more importantly, to be compensated for the loss of business that we've suffered. My clients had an identifiable piece of business worth at least $20 million that we seek to be reimbursed for because of the actions of Optum and the co-defendants. Now, with respect to the property right issue that my opponent mentioned previously, this court and the Supreme Court have time and time again held that intangible property rights such as the right to one's business, the right to compete, the right to service one's customers is the kind of transferable property right that can be extorted. We have an identifiable transferable piece of property, which is the right to service specialty pharmacy patients. Now, they're saying that it's completely the patient's choice and it doesn't amount to a transferable piece of property. No, it isn't. As a pharmacy benefit manager, they're simply managing the provisions of insurance companies that provide coverage for employers across the country itself. I'm not clear of what exactly that is. They say membership is open, and you say it's not. But it goes back to the original question that I asked you at the outset. They did Los Angeles and Dallas and Houston. These are hot places, they said, for fraud. And this is what you say. Well, that was abusive. Those tests were abusive. So you at the outset have got to somehow or another demonstrate that even if you assume that the membership gives you a ticket to something that you're entitled to, I don't see any allegation here or any effort to demonstrate that the reasons given to you for not otherwise admitting you, like everybody else, were invalid. Well, Your Honor, to address one point. First of all, the areas in which my clients operate, even though they're designated so-called hot heat zones, these are the areas where specialty pharmacy patients. But you complained throughout about these examinations that they were wrong and so on and so forth. As I listen to your argument, they don't seem to have anything to do with what you're trying to do. Well, Your Honor, what happened is the only examination of my client that occurred at the outset before my clients were denied entry in the network were with regards to Cedra Houston. There was one, what's called extended credentialing audit. That audit produced an extremely minimal finding. We were, we asked for an opportunity to appeal that finding. We're running out of time. Let me ask you a different way. And I suppose you were members throughout, members of this network. What difference would it have made to your client? Well, obviously no pharmacy, particularly a specialty pharmacy, can exist without being compensated and without being reimbursed by an insurance company. So my clients, being a business, are not in a position to service patients and not getting reimbursed for them. So absolutely, the reason for being in a network is to be reimbursed by insurance companies. That is the only reason why we seek entry in the network. No other pharmacy would possibly think of servicing anyone without, especially in the specialty pharmacy business, without getting reimbursed by insurance companies. So. All right. All right, sir, I think we have your argument. All right. Thank you, counsel, both sides for the briefing and argument. The case will be submitted along with the other cases we heard argument as well as.